UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>vs.<br><br>JOHN KILGALLON, DANIEL C. MOSTELLER, and STEPHEN HOUGHTALING,<br><br>          Defendants. | 1:21-cr-10023<br><br><br>**BRIEF IN SUPPORT OF MOTION TO DISMISS** |

John Kilgallon, Chief of Staff for the United States Marshals Service, through his counsel of record Ronald A. Parsons, Jr. and Scott A. Abdallah, Daniel C. Mosteller, United States Marshal for the District of South Dakota and Stephen Houghtaling, Chief Deputy United States Marshal for the District of South Dakota, through their counsel of record Marty J. Jackley, respectfully submit this brief in support of their motion to dismiss.

## **BACKGROUND**

*"[T]he question is whether the executive branch may adopt and maintain policies and procedures that severely interfere with the ability of the federal judiciary to run the courtroom and chambers."*

Order to Show Cause at 6 (Doc. 1).

*"The Department of Justice, acting through the Marshals Service, has apparently adopted a public policy to the effect that DOJ policies may trump lawful court orders. This cannot be permitted. . . .*

*I sincerely regret that the disputes must continue but I cannot ignore what may be a significant conflict between the Federal Judiciary and the Executive branch of our government."*

Order at 1-2 (Doc. 33).

1

## I.   Governmental Structure

Under the constitutional separation of powers, as concisely explained by Chief Justice Marshall, "the legislature makes, the executive executes, and the judiciary construes the law." W*ayman v. Southard*, 10 Wheat 2, 46, 6 L.Ed.2d 317 (1825). By vesting each branch of government with an exclusive form of power, the Framers purposefully kept those powers separate. *See Patchak v. Zinke*, 138 S.Ct. 897, 904 (2018). Each branch thus "exercise[s] . . . the powers appropriate to its own department," and no branch can "encroach upon the powers confided to the others." *Id.* (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 191 (1881)); *see also INS v. Chadha*, 462 U.S. 919, 951 (1983); *Morrison v. Olson*, 487 U.S. 654, 697-99 (1988) (Scalia, J., dissenting).

As co-equal branches of government, the Executive and Judicial Departments must work together in the spirit of cooperation, collaboration, and mutual respect. As sagely described by Justice Jackson:

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); E. Levi, *Some Aspects of Separation of Powers*, 76 Colum. L. Rev. 371, 378 (1976) ("The constitutional system recognized the possibility of disagreement among the branches, but it defined the channels through which those conflicts were

resolved . . . The system also contemplated responsibility and accommodation, for, though the branches were separate, they were part of one government").

**A.   United States Marshals and USMS are officers and arms of the Executive Branch.**

The United States Marshals Service (USMS) is the nation's oldest federal law enforcement agency, created by the Judiciary Act of 1789 and founded when George Washington appointed the first thirteen U.S. Marshals.  In 1861, Congress placed the marshals under the direct supervision of the Attorney General.  In *Cunningham v. Neagle*, 135 U.S. 1 (1890), the Supreme Court described the collaborative relationship between the Judiciary and United States Marshals, as officers of the Executive Branch under the control of the Department of Justice:

> The ministerial officers through whom [the Judicial Department's] commands must be executed are marshals of the United States, and belong *emphatically* to the executive department of the government. They are appointed by the president, with the advice and consent of the senate. They are removable from office at his pleasure. They are subjected by act of congress to the supervision and control of the department of justice, in the hands of one of the cabinet officers of the president, and their compensation is provided by acts of congress.

*Id.* at 63 (emphasis supplied).  More recently, the Supreme Court has explained:

> The Marshals are within the Executive Branch of the Federal Government. The Marshal for each district is appointed by the President, 28 U.S.C. § 561(a), is subject to the supervision and direction of the Attorney General, *see, e.g.,* §§ 562, 567, 569(c), 571(a) and (d), and is funded through Department of Justice appropriations, *e.g.,* § 567.

*Pennsylvania Bureau of Correction v. U.S. Marshals Service*, 474 U.S. 34, 36 n.1 (1985); *see also* 28 C.F.R. § 0.5(a). The Third Circuit has aptly summarized the placement of U.S. Marshals squarely within the Executive Branch:

Chabal's basic argument against recognizing the President's plenary removal power is that marshals provide a variety of services for the judiciary, some of them arguably essential to the functioning of the courts, and hence the Marshal's office is not merely executive, but quasi-judicial as well.  This argument, however, confuses the question of who benefits from the marshals' law enforcement activities with the question of whether those activities involve executive power.

When a marshal arrests a felon pursuant to a judicial warrant or protects federal judges from assaults in the courtroom, he is executing and enforcing federal laws.  The character of his actions is not changed because interests of federal judges, both personal and institutional, are advanced by those actions. . . .

That assistance provided the judiciary by marshals includes the enforcement of judicial orders in no way alters the executive character of the marshals' duties. . . .

Ultimately, Chabal's argument assumes that the Framers could not have intended the judiciary to be dependent on an independent executive for the vindication of its orders. But the Framers contemplated precisely that result. Alexander Hamilton observed in The Federalist, in explaining why the federal judiciary would be the "least dangerous" branch, that "[t]he judiciary ... must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments." The Federalist No. 78, at 490 (B. Wright ed. 1961). More generally, as we have recognized, "[t]he protection from abuse of power which the separation[-of-powers] concept seeks to provide is not compromised by a necessary degree of cooperation between the three branches."

*Chabal v. Reagan*, 841 F.2d 1216, 1221-22 (3d Cir. 1988) (citations omitted).

As head of the Department of Justice, the Attorney General has full authority to "prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business…" 5 U.S.C. § 301. Thus, "a United States Marshal, when acting pursuant to directions of the Attorney General, is, himself, vested with the executive power necessary to comply with those directions." *United States v. Krapf*, 285 F.2d 647, 650 (3d Cir. 1961).

4

### B.      USMS powers and duties.

Although it has several important functions and responsibilities, the fundamental mission of the USMS is two-fold.  Congress has mandated that:

(a)      It is the primary role and mission of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court, as provided by law.

28 U.S.C. § 566(a).  As provided by law, the USMS thus has two overriding—and equally important—duties: (1) to provide for the security of the courts; and (2) to obey, execute, and enforce court orders as provided by law.

### 1.      USMS duty to provide for the security of the federal courts.

Congress has provided that the U.S. Marshals Service, under the direction of the Attorney General and Executive Branch, retains "final authority" regarding security requirements for the federal courts.  This mandate is express:

(i)      The Director of the United States Marshals Service shall consult with the Judicial Conference of the United States on a continuing basis regarding the security requirements for the judicial branch of the United States Government, to ensure that the views of the Judicial Conference regarding the security requirements for the judicial branch of the Federal Government are taken into account when determining staffing levels, setting priorities for programs regarding judicial security, and allocating judicial security resources.

In this paragraph, the term "judicial security" includes the security of buildings housing the judiciary, the personal security of judicial officers, the assessment of threats made to judicial officers, and the protection of all other judicial personnel.

*The United States Marshals Service retains final authority regarding security requirements for the judicial branch of the Federal Government.*

28 U.S.C. § 566(i) (emphasis supplied); *see also id.* § 566(e)(1)(A); 28 C.F.R. § 0.111(d), (e), (f) and (k); *United States v. Sanchez-Gomez*, 138 S.Ct. 1532, 1536 (2018) ("It is the responsibility of the United States Marshals Service to 'provide for the security … of the United States District Courts'").

As part of this mission, USMS controls all detention management matters for individuals remanded to their custody, including the coordination, scheduling, and secure handling of all prisoners in federal custody through the Justice Prisoner and Alien Transportation System (JPATS), transporting them to court hearings, detention facilities, and correctional institutions across 94 judicial districts. 28 U.S.C. § 561(g); 18 U.S.C. § 4086; 28 C.F.R. §§ 0.111(k), 551.101, 551.102.

Under its command structure headed by its presidentially appointed Director—assisted by the Deputy Director and Associate Directors who manage its operational divisions—USMS supervises and directs all U.S. Marshals from its Headquarters in Arlington, Virginia, through the authority of the President and Attorney General  28 U.S.C. § 561.[1]  Executive branch policy and procedures for court security, as established by the USMS Director, are set forth in USMS Policy Directive 10.2 and overseen by the Assistant Director of the Judicial Security Division of the USMS.  (Doc. 11-4 at 1).

---

[1] The command structure of USMS is reflected in its order of succession in USMS Policy Directive 1.1 (Mission and Organization), attached as Exhibit A, providing that "[t]he Director, Deputy Director, Associate Director for Operations (ADO), and Associate Director for Administration (ADA) comprise the Executive Staff of the USMS."  1.1(D)(3) (Ex. A at 6).  The USMS Chief of Staff position is not a member of the Executive Staff and is not a leadership or policymaking position.  *See id.*

In the individual districts, most duties are performed by highly trained, academy-certified Deputy U.S. Marshals (DUSMs), who are supervised at the district level by a Chief Deputy.  In addition, USMS hires District Security Officers (DSOs) and Court Security Officers (CSOs) to assist DUSMs in performing their functions.  A DSO is an individual secured by USMS under a personal services contract to provide security services under the supervision of USMS district operational employees.   In contrast, CSOs are employees of private security contractors who contract with USMS to assist in court security.  (Doc. 11-6 at 4); *see also Atterbury v. United States Marshals Service*, 941 F.3d 56, 58 (2d Cir. 2019).

The policy of the Executive Branch, established by the Attorney General and USMS in the exercise of their statutory powers and duties regarding court appearances for prisoners in their custody, is clear:

> **Prisoners:**  Any in-custody person, who must be physically present in the courtroom during any proceeding, will be escorted by at least two operational personnel.
>
> a.   District Security Officers and Detention Enforcement Officers may be used as operational personnel for prisoner handling, *though a minimum of one DUSM must be present to provide judicial and courtroom security*.
>
> b.   If more than one in-custody person will be present, there should be one operational employee per prisoner with at least one additional operational personnel when possible; also known as one-on-one, plus one.  *A minimum of one DUSM must be present to provide judicial and courtroom security*.
>
> c.   CSOs are not authorized to serve as part of a prisoner production team.

(Doc. 11-4 at 3) (USMS Policy Directive 10.2) (emphasis supplied).  Simply put, there must be two USMS officers—including at least one Deputy U.S. Marshal (DUSM)—physically present in the courtroom to guard a prisoner at all times.

### 2.    USMS duty to obey, execute, and enforce court orders

The other primary role of the USMS—just as important as its duty to provide court security—is the directive "to obey, execute, and enforce all orders of the United States District Courts . . . as provided by law."  28 U.S.C. § 566(a).  As succinctly stated by the Supreme Court, "[t]he Marshals must obey the mandates of federal courts and transport prisoners if the court so orders."  *Pennsylvania Bureau of Correction*, 474 U.S. at 38.

## II.    Factual Background

### A.    Prior discussions between District of South Dakota and USMS regarding COVID policies and vaccination.

The facts of this case are clear and largely indisputable.  On March 25, 2021, the district court issued a memorandum to employees at the United States Courthouse in Aberdeen,[2] noting that it intended to ask those employed at the courthouse about their vaccination status.  (Doc. 1-1).  The district court stated that it wanted to know whether courthouse employees had been vaccinated so that it "can decide what further action is required[.]"  (Doc. 1-1).  By its terms, this

---

[2] Housed in commercial space leased by GSA, the Aberdeen courthouse in northeast South Dakota is roughly a 2.5 to three-hour drive from both Sioux Falls and Pierre. No non-senior status district or magistrate judge keeps primary chambers there. Neither the USAO nor FPD maintains a staffed office in Aberdeen and no Deputy U.S. Marshals are stationed in Aberdeen, although several CSOs are assigned to the building and DSOs are available to assist.  The District of South Dakota is fortunate, however, to have a senior status district judge who regularly presides over cases assigned to the Northern Division at the Aberdeen courthouse.

memorandum was not directed to the Marshals Service. (Doc. 1-1). On April 13, 2021, however, the district court contacted Chief Deputy Houghtaling to convey that it was awaiting a response to the memorandum. (Doc. 11-2).

On April 15, 2021, U.S. Marshal Mosteller thus responded in a letter, copied to all of the Judges in the District, acknowledging that "this pandemic has required all of us to navigate some uncharted territory," and that he was seeking advice from USMS Office of General Counsel on "the steps we should take to ensure the safety of our personnel, along with their rights/wishes, while still completing our mission to the courts." (Doc. 1-2). Marshal Mosteller explained that USMS Headquarters and its Judicial Security Division were working with the Administrative Office of the U.S. Courts to develop guidance with respect to vaccinations at the national level. (Doc. 1-2). He relayed official USMS policy that because vaccinations were made available to its employees under an Emergency Use Authorization, it was not requiring vaccination at that time. (Doc. 1-2). He also relayed concerns expressed by USMS leadership, including that delving into vaccination status would be "encroaching on EEO statutes when it concerns medical information, disabilities, and religious beliefs." (Doc. 1-2). For those reasons, he also respectfully conveyed official USMS policy that its employees would "not be providing their respective vaccination status to the Court" at that time. (Doc. 1-2).

On May 4, 2021, the Chief Judge for the District of South Dakota forwarded the district court's March 25, 2021 Memorandum and Marshal Mosteller's April 15, 2021 letter along with correspondence addressed to USMS Chief of Staff John

Kilgallon at USMS Headquarters in Virginia.  (Doc. 1-5).  The Chief Judge stated that he was writing "on behalf of the judges of the District of South Dakota" regarding an issue the Court had with the COVID-19 vaccination status of the Deputy U.S. Marshals in the District.  (Doc. 1-5 at 1).  The Chief Judge explained:

> I have a very good working relationship with U.S. Marshal Mosteller and his chief deputy; we have worked together over the past year about how most safely to administer justice and conduct court operations during the pandemic.  I understand that the April 15 letter contains what U.S. Marshal Mosteller understands as the national policy of the U.S. Marshals Service.

(Doc. 1-5 at 1).  The Chief Judge also stated that the district judges in South Dakota wanted to avoid having unvaccinated deputy marshals in the courtroom and inquired whether USMS policy was to not know the vaccine status of deputy marshals and whether USMS intended to have unvaccinated deputies work inside courtrooms where judges require all to be vaccinated.  (Doc. 1-5 at 2).

On morning of May 10, 2021, at 8:24 a.m. (CST) before any scheduled court hearings that day in Aberdeen, Mr. Kilgallon, at the behest of USMS leadership, responded to the Chief Judge by email from USMS Headquarters and attached the agency's official response.  (Doc. 1-6; Doc. 1-9).  The attached letter relayed that USMS "shares the Court's concerns regarding COVID-19 and has been steadfast in its efforts to comply with the Centers for Disease Control and Prevention (CDC) guidance to mitigate the risks associated with transmission of the virus, to include mask wearing, maintaining social distance, donning needed personal protective equipment, and diligent hand hygiene."  (Doc. 1-6 at 1).  The USMS letter assured that it "takes seriously its court security responsibilities and places the highest

priority on maintaining the safety and security of those involved in the judicial process." (Doc. 1-6 at 1).  It noted that USMS currently was facing critical staffing shortages for deputy marshals—69% and 65% of required staffing levels nationally and in South Dakota respectively—which contributed to the limited number of trials, hearings, and pre- and post-trial appearances that could be supported by USMS simultaneously.  (Doc. 1-6 at 1).  As a result, the letter conveyed that any widespread court order or other restriction that would impose limitations on deputy marshals "further degrades our nationwide ability to support the judiciary and may negatively impact the ability of courts to conduct their business when such security is required." (Doc. 1-6 at 1).

The USMS letter relayed that while it shared the goal that everyone in the courtroom be vaccinated, it was improbable for the foreseeable future, particularly given the absence of any legal authority from the Executive Branch at that time to mandate vaccinations for detainees, U.S. Attorneys, defendants, jurors, defense counsel, witnesses, deputy marshals, court security officers, guards, other federal agents, or other participants in criminal or civil matters.  (Doc. 1-6 at 2).

The letter noted that USMS official policy continued to operate under security protocols established based upon CDC guidance and presumed that individuals would be permitted to appear in person with the requirement that they comply with CDC and health authority requirements to mitigate the transmission of the virus.  (Doc. 1-6 at 2).  It further assured the Chief Judge that, regardless of vaccination status, USMS policy was that deputy marshals would take all necessary

precautions to mitigate the risk of transmission by wearing face masks, ensuring social distance while still being mindful of their security mission when assigned to a courtroom proceeding, wearing other personal protective equipment as needed, and practicing diligent hand hygiene.  (Doc. 1-6 at 2).

For all of those reasons, the USMS letter explained that it strongly encouraged but did not mandate that deputy marshals be vaccinated.  (Doc. 1-6 at 2).  It noted that USMS policy was consistent with that of other federal employers at that time, which also did not mandate vaccinations, as well as the Administrative Office of the U.S. Courts, which had issued cautionary guidance that "any adverse action for violating a vaccine mandate, directive or policy is implicitly an unauthorized and impermissible mandate."  (Doc. 1-6 at 2).

The USMS letter stated that the agency estimated that approximately 52 percent of deputy marshals nationwide were fully vaccinated, while the number in South Dakota was approximately 44 percent.  (Doc. 1-6 at 2).  It further explained that there were a number of reasons why deputy marshals and detainees may decide not to be vaccinated, including fears of unknown side effects and long-term adverse effects, incomplete scientific information and evaluation regarding efficacy related to evolving variant strains, fears concerning present and future pregnancy, religious objections, and concerns that the vaccine could negatively affect existing health conditions or disabilities.  (Doc. 1-6 at 2-3).

Finally, the USMS letter explained that its official policy at that time was not to require that its employees divulge their vaccination status to their management

and it was "not inclined to direct [USMS] personnel to provide this information to the court or any other third party."  (Doc. 1-6 at 3).  The letter emphasized, however, that USMS "intend[s] to continue to support the judiciary and perform our court security responsibilities with the professionalism and diligence that we have always demonstrated," including having deputy marshals abide by current CDC protocols when operating in the courtroom.  (Doc. 1-6 at 3).

At 10:34 a.m., the Chief Judge responded by email, stating: "John, I appreciate the timeliness of your response, which will allow me to discuss this matter with my fellow district judges during a scheduled call tomorrow.  You are correct that this is not the response that we had hoped to hear."  (Doc. 1-9).  The Chief Judge then requested some additional clarification on USMS policies and concluded: "Once again, thank you for your responsiveness, John."  (Doc. 1-9).

## B.    May 10, 2021 Hearings

The district court held hearings in criminal cases at the Aberdeen courthouse later that afternoon on May 10, 2021.  The first scheduled proceeding was a sentencing hearing for a violent defendant's fourth petition to revoke supervised release in *United States v. White Tail*, 11-CR-10022, scheduled to commence at 12:30 p.m.  (Doc. 11-7 at 2).  Defendant White Tail previously had been convicted of manslaughter and sentenced to prison for stabbing his brother to death.  (Doc. 11-3 at 25).  One of the staff at the facility where White Tail was committed for treatment of psychiatric problems and methamphetamine abuse had resigned for

the specific reason that she was terrified of White Tail.  (Doc. 11-3 at 15).  As detailed by the Assistant U.S. Attorney at the hearing:

> And so when [White Tail] commenced his fourth period of supervision in June of 2020, within two months he was back using meth and admitting that.  And then by October of last year, the police received a report that the Defendant was shirtless in McLaughlin, and of all things, in possession of a knife and swinging it around.
>
> So this Defendant is more than a mild public safety concern.  And if he's having a major anxiety issue in meth treatment where staff are walking away, he needs to maybe think about making some choices about how he interacts with people and treats people.
>
> But then we can learn from that night when he was arrested, that the BIA officers were looking for him and there was an extended cat and mouse game where he was harassing the community and then ultimately, arrested after he drops to his knees, but not before he twists around and smacks the officer in the side of the torso and face and shoulder and then tries to kick at the officer.

(Doc. 11-3 at 20-21).  As the district court summarized at the May 10, 2021 hearing:

> When I saw this Defendant the first, second, or third time – I can't recall now – I made a note to myself in the papers, "this Defendant is a very dangerous individual."  And I still think that's right.  I mean, this situation with stabbing his brother to death, stabbing him seven times – I recall the case very well.  I don't remember a lot of these cases, but this one I do.  And he had tried to kill his brother a short time before that, as I recall.

(Doc. 11-3 at 25).  White Tail's federal public defender also acknowledged that, without additional treatment, White Tail "clearly has been" and "clearly will be" a danger in future.  (Doc. 11-3 at 22).

Before White Tail's sentencing hearing began, but on the record, the Court asked the deputy marshal in attendance—who was masked and in full compliance with all district standing orders—whether she had been vaccinated:

14

THE COURT:         And you have been fully vaccinated, ma'am?

DUSM KINNEY:       Me?

THE COURT:         Yes.

DUSM KINNEY:       Sir, I respectfully decline to answer that.

THE COURT:         All right.  You may leave the courtroom immediately.

DUSM KINNEY:       Okay, sir, I'll have to take him with me then.

THE COURT:         No, you won't.  I told the Marshal what to do on that and
                   you should follow those orders.

DUSM KINNEY:       Go back and tell [DSO] Kolb, please.
                   May we have - -

THE COURT:         Don't come in this courtroom again unless fully
                   vaccinated.  Do you understand that?

DUSM KINNEY:       Yes, sir.

THE COURT:         All right. You may leave. Leave the Defendant where he
                   is.

DUSM KINNEY:       Judge, I can't leave him alone.

THE COURT:         Yes, you're going to do exactly what I tell you to do or you
                   will be in custody yourself.  If you don't have a marshal
                   here that's fully vaccinated, that's your problem, not
                   mine.  You may leave, ma'am.

DUSM KINNEY:       Judge, I can't leave a prisoner in here.

THE COURT:         Yes, you will. I'm going to give you 10 seconds to leave
                   this courtroom.   (Brief pause.)   Don't come back here
                   unless you're fully vaccinated.

(Doc. 11-3 at 4-5).  The deputy marshal obeyed the district court and departed the

courtroom in violation of USMS security policy.  (Doc. 11-3 at 5).  The other deputy

marshal assigned to transport prisoners to Aberdeen for the hearings that day—

15

who also was ineligible to enter the courtroom under the Court's verbal order—stood on alert outside the door to try to ensure the safety of those remaining inside.

A District Security Officer (DSO)—who was not a Deputy U.S. Marshal but is incorrectly identified in the transcript as "DUSM Kolb"—was permitted to remain in the courtroom with the prisoner after disclosing to the Court that he had been vaccinated.  (Doc. 11-3 at 5).  At the close of White Tail's hearing, the district court stated to the DSO, "I appreciate the Marshal stepping in and taking care of things here.  We're not looking for any confrontations here, but I'm going to see that things are run correctly in this courtroom."  (Doc. 11-3 at 27-28).

To say that the district court's order barring the Deputy U.S. Marshal in charge of the prisoners from the courtroom and requiring her to leave the prisoner behind resulted in alarm at USMS Headquarters would be an understatement.  As set forth above, USMS policy requires that at least deputy marshal be present to provide security whenever an in-custody person is physically present in the courtroom, regardless of the presence of a DSO or CSO.  (Doc. 11-4 at 3).  At that point, to ensure courthouse safety and security, USMS Headquarters instructed its officers in the District of South Dakota to temporarily remove the prisoners in USMS custody from the Aberdeen courthouse and transport them to the nearest appropriate jail facility so that the situation could be sorted out.  (Doc. 1-4 at 6).

The district court was still on the bench when the decision was made.  Shortly after 2:00 p.m., Chief Deputy Houghtaling, who at the time was more than three hours away in Sioux Falls, called the Aberdeen chambers seeking to advise

and confer with the Court.  (Doc. 1-3; 1-4 at 6).  At 2:12 p.m., he was informed that the Court unfortunately was conducting an unrelated hearing.  Chief Deputy Houghtaling advised that the call was very important and a message was left requesting the district court to please return the call.  (Doc. 1-3; Doc. 1-4 at 6).

About fifteen minutes later, Chief Deputy Houghtaling spoke to the Court in a phone call broadcast in the courtroom and explained that once the deputy marshal was excluded from the courtroom and required to relinquish physical custody of the prisoner, USMS headquarters had determined that it could not safely provide the level of security required under its policies for court proceedings.  (Doc. 1-4 at 5).  He further explained that USMS policy unequivocally required a deputy marshal in the courtroom when an in-custody defendant was present and relayed the instructions given to him that it was USMS policy at the national level that its employees did not have to disclose their vaccination status.  (Doc. 1-4 at 5-7).

The Court advised, "so I guess we have a direct confrontation between the Marshals Service and the Administrative Office [of U.S. Courts], as well as all of the federal judges in South Dakota," (Doc. 1-4 at 7), to which Chief Deputy Houghtaling respectfully replied: "Right, Judge. That's the last thing – the absolute last thing I would wish for." (Doc. 1-4 at 7).

Ultimately, an IT person for the district court proposed a solution whereby the prisoners in custody appeared for their scheduled hearings that same day via video conferencing in a third-floor room of the courthouse with the deputy marshal

present as required.  (Doc. 1-4 at 12-15).  As those arrangements were made, the

following exchange occurred:

> THE COURT:       I mean, this is going to be a major confrontation.
> So stand by for a ram.  And if the Court of Appeals says I'm wrong, it
> wouldn't be the first time.
>
> CHIEF DEPUTY HOUGHTALING:   That's right, judge.  I recall often
> you saying that you're not wrong until the Eighth Circuit tell you
> you're wrong.
>
> THE COURT:       That's right.
>
> CHIEF DEPUTY HOUGHTALING:    But, I – Judge, I just want to be
> so clear, this is not something I want or the agency wants.  I mean,
> we're between a rock and a hard place.  I do not want confrontation.  In
> fact, I want the opposite of that.  I want – would prefer instead the
> relationship that we have enjoyed over the years instead of this.
>
> THE COURT:       I understand.  And I'm not looking for confrontation
> either, of course, but that's what I have here.

(Doc. 1-4 at 16).  USMS facilitated the prisoners' expeditious return to the federal

courthouse and court records demonstrate that all afternoon proceedings went

forward, with a maximum time span of 39 minutes between hearings, all of which

were concluded at approximately 4:34 pm.  (Doc. 11-7 at 1-8).

### C.   Resolution of vaccination policies through new standing orders.

On May 21, 2021, the Chief Judge for the District of South Dakota issued

Standing Order 21-6 (Access and Rules within Courthouses Due to Status of

COVID-19 Pandemic).[3]  Standing Order 21-6 provided, among other things, that

masks were not required for individuals who had been vaccinated, and that those

*not* vaccinated—including Deputy U.S. Marshals, among others—must wear them

---

[3] https://www.sdd.uscourts.gov/so2106.

in all common areas, including within the courtroom.  *See id.*  The standing order noted that due to the fluid nature of the pandemic and the need for flexibility in responding, individual judges may determine whether different standards should apply for a particular court proceeding.  *See id.*

On May 25, 2021, the Court issued Standing Order 21-7 (Northern Division Supplement to Standing Order 21-06) specific to the Aberdeen courthouse.[4] Standing Order 21-7 provided that persons not fully vaccinated or "as to whom we do not know the fully vaccinated status" shall at all times inside the courthouse wear an N-95 mask or a double mask.  *Id.*  The standing order further provides that all persons who have not been fully vaccinated or whose vaccination status is unknown "shall also at all times within the courthouse maintain social distancing of not less than six feet from all other persons," and that those individuals "shall not enter into the chambers of the court, library rooms, office of the magistrate, office of the judicial assistant, office of the law clerks, the bathroom adjacent to the copy room, the 4th floor jury room, or the copy room." *Id.*

On August 4, 2021, as the COVID-19 pandemic status continued to remain fluid and change, the Chief Judge amended Standing Order 21-6 to provide, among other things, that masks must be worn at all times in any courthouse located in a South Dakota county "experiencing substantial or high transmission of COVID-19 as defined by the CDC," and that "[a]ll people who are not fully vaccinated – including jurors, court employees, witness, CSOs, Deputy U.S. Marshals, parties

---

[4] https://www.sdd.uscourts.gov/so2107.

and attorneys – must wear a mask within all common areas of the courthouse, including the courtroom."[5]   USMS fully abides by all of these standing orders and, to the knowledge of the law enforcement officials here, no similar problems or issues regarding hearings at the Aberdeen courthouse or any other federal courthouse in South Dakota have arisen since that time.

## III.    Procedural Background

On May 19, 2021, the Court issued an Order to Show Cause detailing the dispute and stating that "the question is whether the executive branch may adopt and maintain policies and procedures that severely interfere with the ability of the federal judiciary to run the courtroom and chambers."  (Doc. 1 at 6).  Specifically, the Court concluded that "[t]he Marshals Service thus directly violated previous orders for hearings and the rights of the defendants, their attorneys, the AUSA's court personnel, and the Court itself," when the Marshals Service "kidnaped" the criminal defendants from the courthouse after the deputy marshal was ordered out of the courtroom.  (Doc. 1 at 5).  The Court further expressed that it was "fully aware of the apparently upcoming advice from the administrative office of the United Courts" and it "respectfully disagree[d] with their advice."  (Doc. 1 at 10).

The Order required Marshal Mosteller, Chief Deputy Houghtaling, and Mr. Kilgallon "to appear personally before this Court and show cause, if any there be, why they should not be found to be in civil contempt of this Court, with possible monetary sanctions if found to be in contempt."  (Doc. 1 at 10).

---

[5] https://www.sdd.uscourts.gov/content/access-and-rules-within-courthouses-due-status-covid-19-pandemic.

The Court set the matter for hearing on June 14, 2021.  Three days before the hearing, the United States requested a continuance, stating:

> On June 9, 2021, the Defendants filed their response to the Order, and explained why civil contempt was not warranted.  On June 10, 2021, undersigned counsel has been advised that the Court had a conversation with United States Marshals Service Director Donald Washington.  We understand that in this conversation, the Court explained that it viewed this case as one potentially raising criminal, rather than civil contempt.  We also understand the Court indicated that the Individual Defendants could avoid criminal contempt proceedings if they agreed to meet certain specified conditions.
>
> . . . The Individual Defendants very much hope that the Court decides not to initiate criminal contempt proceedings, and we believe that there would be no basis for such proceedings.  But the Individual Defendants are unable to agree to the conditions suggested by the Court.

(Doc. 12 at 2).  That same day, the Court issued an Order denying the request for continuance.  The Order determined that the conduct of the law enforcement officials "cannot be civil contempt," and advised that the hearing instead would be used to serve notice of criminal contempt charges to the named law enforcement officials under Rule 42 of the Federal Rules of Criminal Procedure.  (Doc. 14).

The hearing was held on June 14, 2021, with the three named law enforcement officials present at the Aberdeen courthouse.  (Doc. 15).  A complete transcript is contained in the record, in which the Court observed that "apparently, the policy of the Justice Department – which I don't know whether there's a hold over from the Trump Administration or is it the policy now of the Biden Administration – is that the Marshals Service has the right to decide whether or not court hearings will go forward."  (HT at 8).  In addition, the Court emphasized that

"I am not personally offended by this, nobody said anything that was disrespectful. They just acted in a contemptuous manner – criminal contempt." (HT at 12). The Court further noted it had "some compassion for these Defendants" and stated that "[t]hey are certainly good public servants, for the most part." (HT at 15).

On June 15, 2021, the district court issued its Order making it official that the three law enforcement officials were each charged with criminal contempt under 18 U.S.C. 401. (Doc. 21). The Order specifically articulated that the essential facts are that: "On or about Monday, May 10, 2021 [these Defendants] did, in concert and in conspiracy, misbehave by ordering or allowing a deputy U.S. marshal, one of their subordinates, to remove three criminal defendants . . . from this courthouse, without first notifying or asking permission from this Court and in violation of each defendant's scheduling order, causing said criminal defendants' hearings to be delayed, and thereby obstructing the administration of justice in those defendants' cases" in violation of Rule 42(a)(1)(C) and 18 U.S.C. 401(1). (Doc. 21 at 1).

The Order then set forth an alternative basis under 18 U.S.C. 401(3), again premised upon the Court's lawful scheduling orders by "ordering or allowing a deputy U.S. marshal, one of their subordinates, to remove three criminal defendants[.]" (Doc. 21 at 1). The Order stated that "[t]hough these orders were not directed at the Marshals, the actions of the three defendants interfered with those orders being carried out as specified and, thereby, the above charged contemnors did engage in a conspiracy to obstruct the administration of justice." (Doc. 21 at 1). Following the procedure under Rule 42(a)(2), the Order requested the United States

Attorney for the District of South Dakota prosecute the three named law enforcement officials and stated that if the Department of Justice declined to prosecute them, the Court would appoint a private attorney to do so. (Doc. 21 at 2).

On June 17, 2021, the United States Attorney's Office filed a Notice of Recusal. (Doc. 26). That same day, the United States Department of Justice, Criminal Division, Public Integrity Section filed its Notice of the United States Department of Justice Regarding Decision to Decline Prosecution stating: "Following careful consideration of the Court's June 15, 2021 Order, the Department of Justice notifies the Court that it respectfully declines to accept this matter for prosecution." (Doc. 29).

On June 29, 2021, the district court entered an Order appointing a private attorney as special prosecutor under Rule 42(a)(2) with his "compensation to be paid by the Administrative Office of the United States Courts." (Doc. 33 at 3). The district court also formally recused or disqualified itself under 28 U.S.C. § 455(a) "from hearing or determining anything further in the above matter." (Doc. 33 at 3).

In summarizing the dispute, the Court stated in the Order that "[t]he Department of Justice, acting through the Marshals Service, has apparently adopted a public policy to the effect that DOJ policies may trump lawful court orders. This cannot be permitted." (Doc. 33 at 1). In conclusion, the Court emphasized: "I sincerely regret that the disputes must continue but I cannot ignore what may be a significant conflict between the Federal Judiciary and the Executive

branch of our government."  (Doc. 33 at 1-2).  All of the district and magistrate judges of the District of South Dakota then recused themselves as well.  (Doc. 34).

## ARGUMENT

## I.    THIS COURT SHOULD DISMISS THE CONTEMPT PROCEEDINGS.

### A.    Where criminal contempt charges are brought under the Judiciary's inherent authority, courts retain inherent authority to dismiss them short of trial.

Criminal contempt is "punitive" and imposed "to vindicate the authority of the court." *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911).  Unlike civil contempt, where the violator or "contemnor" has refused to perform a discrete, affirmative act commanded by the court, an individual charged with criminal contempt is accused of having "do[ne] that which he has been commanded not to do."  *Id*. at 442.  The alleged disobedience thus is in the past—a "completed act"— that no sanction can undo. "The traditional justification for the relative breadth of the contempt power has been necessity: Courts independently must be vested with 'power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates[.]'" *Int'l Union United Mine Workers of America v. Bagwell*, 512 U.S. 821, 831 (1994) (citation omitted).

In 1831, following substantial controversy over abuse of criminal contempt powers, Congress enacted a major revision to the Judiciary Act of 1789 that "narrowly confined" and "substantially curtailed" the inherent authority of federal courts to bring criminal contempt charges only to three specific instances, to the exclusion of all others, defined in what is now 18 U.S.C. § 401.  *See Bloom v. State of Illinois*, 391 U.S. 194, 202-03 (1968); *Cammer v. United States*, 350 U.S. 399, 404

(1956); *Nye v. United States*, 313 U.S. 33, 45-48 (1941); *United States v. Aleo*, 681 F.3d 290, 310 (6th Cir. 2012) (Sutton, J., concurring). In 1946, Rule 42 of Federal Rules of Criminal Procedure was adopted to establish procedures for judicial exercise of the criminal contempt power. *See Bloom*, 391 U.S. at 205; *Schleper v. Ford Motor Co.*, 585 F.2d 1367, 1371 (8th Cir. 1978); *In re Weeks*, 570 F.2d 244, 247 (8th Cir. 1978). Not being eligible for classification as a summary proceeding under Rule 42(b), this case is governed by Rule 42(a).[6]

Because "criminal contempt is a crime in every fundamental respect," persons so charged are entitled to the full panoply of constitutional and procedural rights, including trial by jury,[7] assistance of counsel, presumption of innocence and requirement of proof of every element beyond a reasonable doubt, protection from double jeopardy, discovery, and—except in cases of summary adjudication of direct contempt under Rule 42(b)—an independent prosecutor governed by the ethical rules. *Bloom*, 391 U.S. at 201; *see also Int'l Union United Mine Workers*, 512 U.S. at 826-33; *United States v. Waggoner*, 103 F.3d 724, 727 (8th Cir. 1997).

In *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787 (1987), the Supreme Court thus recognized that federal courts possess inherent authority to initiate contempt proceedings for disobedience to their orders, and that this

---

[6] In reading older cases, it becomes apparent that in the past Rule 42(a) prescribed the process for summary contempt cases and Rule 42(b) applied to all other cases. Following an amendment in 2002, the reverse is now true and Rule 42(a) sets forth the procedure for all non-summary contempt cases such as this. *See* 3A Fed. Prac. & Proc. Crim. § 701 (4th ed. April 2021 update).

[7] "Petty contempt like other petty criminal offenses may be tried without a jury." *Int'l Union United Mine Workers*, 512 U.S. at 837 n.5 (quoting *Tayler v. Haynes*, 418 U.S. 488, 495 (1974)).

authority necessarily includes the ability to appoint an independent attorney to prosecute the contempt, while requiring that "[a] private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution." *Id.* at 804.  This must be so because '[t]he Government's interest is in dispassionate assessment of the propriety of criminal charges for affronts to the Judiciary." *Id.* at 805.

Jurisprudence regarding the criminal contempt power of the courts is girded by the fundamental principle of judicial restraint, for "[w]hile a court has the authority to initiate a prosecution for criminal contempt, its exercise of that authority must be restrained by the principle that 'only [t]he least possible power adequate to the end proposed' should be used in contempt cases." *Young*, 481 U.S. at 801 (quoting *Anderson v. Dunn*, 6 Wheat 204, 231 (1821)); *see also Lindsey v. Ipock*, 732 F.2d 619, 625 (8th Cir. 1984).  The Supreme Court further has noted that "over the years in the federal system there has been a recurring necessity to set aside punishments for criminal contempt as either unauthorized by statute or too harsh." *Bloom*, 392 U.S. at 206. As the Eighth Circuit, quoting Chief Justice Taft, has cautioned: "The power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court is most important and indispensable. But its exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions." *In re Weeks*, 570 F.2d 244, 247 (8th Cir. 1978) (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)).

26

Although the contempt power may be—and has been—limited by Congress, when initiated by the Judiciary under its Article III powers, criminal contempt nonetheless is a *sui generis* proceeding brought by the court for protection of judicial authority. *See Conley v. United States*, 59 F.2d 929, 935 (8th Cir. 1932); *In re Nevitt*, 117 F. 448, 455-56 (8th Cir. 1902). This is not a case indicted under the prosecutorial authority of the Executive Branch. The district court itself issued an order under Rule 42(a)(1) charging these law enforcement officials with crimes. (Doc. 21). Following recusal of the entire United States Attorney's Office, the Department of Justice then affirmatively declined to bring charges. (Doc. 29).

Where criminal contempt proceedings are instituted under the order and direction of a district court, it retains inherent power and authority to dismiss the proceedings without the necessity of a trial. As Wright and Miller treatise explains:

> The prosecution-on-notice process of Rule 42(a) does not limit the authority of the federal district judge, or does it make institution of a contempt proceeding contingent upon the consent of any attorney. The judge may dismiss contempt proceedings sua sponte before trial.

3A Fed. Prac. & Proc. Crim. § 709 (4th ed. April 2021 update); *see also United States v. Kelsey-Hayes Co.*, 476 F.2d 265, 266 (6th Cir. 1973) (dismissing appeal from district court's dismissal of criminal contempt proceeding where there was lack of probable cause and further prosecution would not serve the public interest); *United States v. Barnett*, 346 F.2d 99, 100 (5th Cir. 1965) (holding that court had power and authority to dismiss criminal contempt proceedings where continuation of the proceedings was no longer in the public interest).

Because this criminal contempt action is a *sui generis* proceeding initiated by the Judiciary under its inherent authority, this Court retains full inherent authority—even on its own initiative—to dismiss the proceedings. *See also 3A Fed. Prac. & Proc. Crim.* § 709 (explaining that under Rule 42(a)(1), "[t]he pleadings may rest only on information and belief, but the court has discretion to require a showing of probable cause before giving notice or proceeding further with a hearing on the charge).

### B.   The charges should be dismissed in the public interest and interests of justice.

#### 1.   This is an inter-branch policy dispute that should not be the subject of individual criminal charges.

As the Eighth Circuit has held, "the contempt power is a drastic remedy, and it should be invoked only when the right to its use is clear." *Schleper*, 585 F.2d at 1372.  In the present circumstances, the Executive Branch claims final authority under federal law for safety and security in federal courthouses and the prisoners committed to its custody.  The Judicial Branch requires adherence to its orders and claims final authority over federal court dockets and the scheduling of proceedings held before them.  Both branches are correct.

In these exceptional circumstances, it is very respectfully suggested that the public interest, including the interests of Judicial and Executive Branches of the United States government, calls for a dismissal.  Although issued in dissent, Justice Stevens has provided wise and useful guidance for rare situations involving inter-branch disputes such as this:

This is an exceptional case. It involves a dispute between the Marshals Service and a Federal District Court. Ordinarily, the marshals and the federal courts which they serve have a close and harmonious relationship. To be sure, the special responsibilities of the marshal—an office that serves both the Executive and Judicial Branches—can give rise to administrative problems. Customarily such problems are resolved on a voluntary, cooperative basis, either in the individual court or circuit, or in high-level discussions between the Executive and Judicial Branches. Open disputes between the marshals and the courts are rare, and appropriately so. . . .

Throughout our history, the marshals have played an important role in the administration of justice. Although their most dramatic exploits may be called to mind by references to names like Bat Masterson, Wyatt Earp, and David Neagle, or to events like the enforcement of civil rights legislation in the 1960's, the primary assistance to the Federal Judiciary provided by the marshals has been in the area of protection of the trial process, including the courtroom itself, and the service of writs issued by the judges. . . .

These daily instances of judicial authority over the marshal reflect the conventional relationship between the court and the marshal. The closeness of the relationship is derived, not from an assertion of judicial power over an unwilling marshal, but from the cooperative nature of the shared mission to administer justice. . . .

This is not the kind of confrontation that should arise between the marshals and the federal courts. There are a variety of mechanisms that should be used before the marshals and the courts engage in judicial combat. The district judges and the individual marshals should be able to resolve most difficulties. If they are unable to, the Circuit Conference should be asked to intervene. If the problem is a recurring, national disagreement, as this issue seems to be, the Marshals Service and the Judicial Conference can seek to address it.

*Pennsylvania Bureau of Correction*, 474 U.S. at 44-51 (Stevens, J., dissenting).

Here, the district court had issued scheduling orders establishing the time and place for prisoner hearings, a schedule with which USMS was expected to comply by ensuring that the prisoners were available. (Doc. 18 at 5-10). The district court then barred the deputy marshal into whose custody the prisoners were

committed from the courtroom.  Under USMS policies regarding safety and security for federal courts, deputy marshals may not leave prisoners in the courtroom if they cannot be present to maintain control over them.  On threat of immediate arrest by the Court, the deputy marshal departed and contacted her superiors.

After the deputy marshal was barred from the courtroom, law enforcement officers in the District of South Dakota were instructed, in the implementation of Executive Branch policy regarding courthouse safety and security, to temporarily remove the prisoners to the detention facility at which they were being held to accommodate their scheduled court appearances.  These officers were in a no-win situation—stationed by their official responsibilities between a rock and hard place—forced to choose between disobeying Executive Branch orders and policies established to minimize risk to life and limb or contributing to a situation in which the district court's schedule may be delayed.  They were forced at that moment to choose between conflicting direction from Executive and Judicial Branches.

If the prisoner who remained in the courtroom—a man imprisoned for killing before—had killed or injured himself or someone else after the deputy marshal departed in direct violation of Executive Branch policies, it would have been disastrous for everyone involved.  In the interests of safety and security, the law enforcement officials believed they had no choice but to follow orders from USMS Headquarters to temporarily remove the prisoners to the local detention center until the situation could be sorted out.

For that, these public servants now stand charged with being criminals themselves.  As a result of these proceedings, private attorneys paid by the Judicial Branch's Administrative Office for the U.S. Courts are prosecuting Executive Branch officials defended by private attorneys paid by the United States Department of Justice.  The special prosecutor selected by the Judicial Branch and the Department of Justice that has filed a Statement of Interest on behalf of the United States disagree even on the appropriate caption for these proceedings, (Doc. 41; 42; 43), but the most accurate caption would be "United States v. United States."

The apparent dispute between these separate but co-equal branches of government raises serious, legitimate questions about the separation of powers; the correct application of federal statutes; the health, safety, and security of everyone who enters a federal courthouse; and the proper spheres of federal authority for which there are no easy answers. Respectfully, the United States government should be working together to resolve these policies differences.

But these law enforcement officials, their families, and their careers should not be utilized—*in a criminal prosecution*—as proxies in what the district court has expressly recognized and characterized in the charging documents as a policy dispute between the Judicial and Executive Branches of the federal government.

### 2.    The new standing orders should prevent recurrence.

It further is in the public interest and interests of justice to dismiss this matter because the standing orders under which the District of South Dakota is now operating, detailed in the background section above, appear to have resolved

31

the issues that gave rise to this inter-branch dispute.  It is the understanding of the individual law enforcement officials charged in this proceeding that USMS is fully complying with those orders and they are not aware of any further issues or disputes regarding these matters in the District of South Dakota.

Of course, the COVID-19 pandemic our nation is experiencing is unpredictable and the responses of the United States, state governments, and our society as a whole are constantly shifting.  Federal policy, established by authority of the Executive Branch, has been evolving as well.[8]  Whether or not these issues have been forever resolved, however, under no circumstances should these public servants be charged with crimes or otherwise punished for implementing USMS policy regarding court safety and security exactly as instructed by Executive Branch leadership at the time under its express and final authority granted by Congress to the USMS.  28 U.S.C. § 566(a) and (i).  It is not in the public interest or the interests of justice to do so.

### C. The charges also should be dismissed because criminal contempt under 18 U.S.C. 401 cannot be established and there is no probable cause that any crime was committed.

The charging statute provides that federal courts "shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

---

[8] *See* https://www.govexec.com/management/2021/08/justice-department-outlines-vaccine-attestation-and-testing-protocols/184554/.

(3)   Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

18 U.S.C. § 401; *see also United States v. Ali*, 682 F.3d 705, 708 (8th Cir. 2012). Section 401, of course, must be read in conjunction with 28 U.S.C. § 566(i) that "[t]he United States Marshals Service retains final authority regarding security requirements for the judicial branch of the Federal Government."

The order initiating these proceedings brought three specifications of criminal contempt under subsection 401(1) and three specifications under subsection 401(3) against each law enforcement official for the three hearings that were delayed as the result of the temporary transfer of prisoners in USMS custody.[9]

### 1.   Section 401(1) is inapplicable as a matter of law because its proximity requirement cannot be met.

Criminal contempt under subsection 401(1) has four elements that must be proven beyond a reasonable doubt: (1) misbehavior; (2) in or near the presence of the court; (3) with criminal intent; (4) that resulted in an obstruction of the administration of justice. *See United States v. Ortlieb*, 274 F.3d 871, 874 (5th Cir. 2001); *United States v. McGainey*, 37 F.3d 682, 683 (D.C. Cir. 1994).

As discussed in detail below, there was no misbehavior or criminal intent that could support a criminal contempt conviction under either subsection 401(1) or 401(3).   But there is an even more immediate basis to conclude that there could never be any conviction under the specifications based on subsection 401(1).   On

---

[9] No specifications, of course, were brought under subsection 401(2).   As discussed above, the United States Marshal and his Chief Deputy are Executive Branch Officers and Mr. Kilgallon is an Executive Branch employee under the authority of the President and Attorney General.

May 10, 2021, when the alleged criminal contempt occurred, Chief Deputy Houghtaling was more than 200 miles away in Sioux Falls. Marshal Mosteller was driving south from Pierre, about 160 miles away from Aberdeen, on his way to Sioux Falls. USMS Chief of Staff Kilgallon was in Virginia. Certainly, there is no evidence that any of them were anywhere near the federal courthouse in Aberdeen.

The Supreme Court has held that the requirement in the text of subsection 401(1) that contumacious conduct be committed by "any person in its presence or so near thereto as to obstruct the administration of justice" as a spatial limitation intended to mean the immediate geographic vicinity of the courtroom. *Nye v. United States*, 313 U.S. 33, 52 (1941) (holding that under section 401(1) it is not sufficient that the alleged misbehavior had some direct relation to the work of the court, since the word "near" is a spatial limitation and suggests physical proximity rather than merely a causal connection); *see also United States v. Rangolan*, 464 F.3d 321, 326-27 (2d Cir. 2006); *United States v. Arrendondo*, 349 F.3d 310, 316-17 (6th Cir. 2003); *Taberer v. Armstrong World Indus., Inc.,* 954 F.2d 888, 897 n.10 (3d Cir. 1992); *In re Stewart*, 571 F3d 958, 966 (5th Cir. 1978).

As a result, the specifications brought under subsection 401(1) should be dismissed as a matter of law.

### 2.   Neither subsection 401(1) nor 401(3) are applicable because there was no misbehavior or criminal intent.

More fundamentally, the criminal contempt specifications should be dismissed because there is no competent evidence or probable cause that the officers

in this case acted with criminal intent or a wrongful state of mind, a requirement for conviction under any of the three subsections of 18 U.S.C. § 401.

In *Maness v. Meyers*, 419 U.S. 449, 467-68 (1975), the Supreme Court held that an attorney who had in good faith raised a Fifth Amendment challenge on behalf of his client could not be adjudged guilty of criminal contempt even if the advice given proved incorrect.  That holding reflected the Supreme Court's holding in an earlier case that "if an attorney acts in good faith and his advice is well founded and in the just interests of his client, he cannot be held liable for any error in judgment." *In re Watts & Sachs*, 190 U.S. 1, 29 (U.S. 1903).  As the Supreme Court rhetorically asked in that case:

> What evidence is there that these attorneys, or either of them, gave any advice or took any action in bad faith, not in the honest discharge of their duty as counsel, but with the deliberate intent to have the federal court set at defiance [of the state court] and its orders treated with contempt?

*Id*. at 32.  Concluding there was no such evidence, the Supreme Court vacated the convictions.  *See id.*; *Waste Conversion, Inc. v. Rollins Environmental Services (NJ), Inc*., 893 F.2d 605, 610-12 (3d Cir. 1990) (reversing judgments of contempt and dismissing charges on same basis).

Relying on governing precedent, the Eighth Circuit also has construed 18 U.S.C. § 401 "to require a showing that the criminal condemnor acted with criminal intent." *United States ex rel. Shell Oil Co. v. Barco Corp*., 430 F.2d 998, 1001 n.5 (8th Cir. 1970) (describing "criminal intent" as an "essential element" of criminal

contempt); *see also United States v. Dowdy*, 960 F.2d 78, 81 (8th Cir. 1992) (act is willful if person knows or should reasonably be aware that conduct is wrongful).

This is in accord with the law in other circuits as well.  As the D.C. Circuit has explained:

> Knowledge that one's act is wrongful and a purpose to nevertheless do the act are prerequisites to criminal contempt, as to most other crimes. Good faith pursuit of a plausible though mistaken alternative is antithetical to contumacious intent, however unimportant it may be in the context of civil contempt.

*In re Brown*, 454 F.2d 999, 1007 (D.C. Cir. 1971).  And as the Seventh Circuit has confirmed:

> Willfulness, for the purpose of criminal contempt, does not exist where there is a "[g]ood faith pursuit of a plausible though mistaken alternative." To provide a defense to criminal contempt, the mistaken construction must be one which was adopted in good faith and which, given the background and purpose of the order, is plausible.

*United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974); *see also United States v. Kouri-Perez*, 187 F.3d 1, 8 (1st Cir. 1999) ("Criminal contempt power is to be reserved for conduct that bespeaks a criminal *mens rea*"); *In re Farquhar*, 492 F.2d 561, 564 (D.C. Cir. 1973) ("Criminal contempt requires both a contemptuous act and a wrongful state of mind").

Regarding a criminal contempt charge brought under subsection 401(3), specifically, the Supreme Court has held that "[o]rdinarily, one charged with contempt of court for failure to comply with a court order makes a complete defense by proving that he is unable to comply." *United States v. Bryan*, 339 U.S. 323, 330 (1950); *see also Acosta v. La Piedad Corp.*, 894 F.3d 947, 951 (8th Cir. 2018); *United*

*States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974); *United States v. J. Myer Schine*, 260 F.2d 552, 555 (2d Cir. 1958).

As the Eighth Circuit further has explained, "[i]n order to sustain a conviction for criminal contempt the order must be specific and the contemnor must be aware of the order and be guilty of willfully violating its specific terms." *In re Weeks*, 570 F.2d 244, 245 n.1 (8th Cir. 1978). "In the context of criminal contempt, willfulness 'means a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of any order.'" *In re Medlock*, 406 F.3d 1066, 1071-72 (8th Cir. 2005) (citation omitted); *In re Holloway*, 995 F.2d 1080, 1082 (D.C. Cir. 1993) (holding that "although § 401(3) does not explicitly mention mens rea, wrongful intent is necessary"); *Doral Produce Corp. v. Paul Steinberg Assoc., Inc.*, 347 F.3d 36, 37 (2d Cir. 2003) ("[B]ecause willfulness is an essential element of criminal contempt, one may not be held in contempt for violation of a court's order unless the order was of sufficient clarity to give the individual clear warning that the conduct is prohibited"); *In re Gates*, 600 F.3d 333, 339 (4th Cir. 2010) (holding that under 18 U.S.C. § 401(3) "criminal intent is an essential element of the offense") (citation omitted).

In the present circumstances, the criminal contempt specifications should be dismissed because there is no evidence or probable cause that the law enforcement officials acted with any criminal intent or wrongful state of mind. Once the deputy marshal was barred from the courtroom, the law enforcement officers here were unable to comply with Executive Branch policy requiring at least one deputy

marshal in the courtroom with a prisoner at all times, comply with Executive Branch orders from USMS Headquarters to temporarily remove the prisoners, and at the same time produce the prisoners in the courtroom without a deputy marshal permitted to be present.

Marshal Mosteller and Chief Deputy Houghtaling were acting on instructions from USMS Headquarters, which in turn was acting under its express statutory authority conferred by federal law.   The law enforcement officials here were following lawful direction of USMS, a component of the Department of Justice, which had promulgated valid policy directives under its statutory authority.  *See* 5 U.S.C. § 301; 28 U.S.C. 566(a) and (i).   No misbehavior, criminal *mens rea*, or wrongful intent may be inferred from such actions.   This was an operational policy dispute between branches of the United States government.

The specifications brought against Mr. Kilgallon, a USMS employee who is not in a command or policymaking position,[10] are based on the sole fact that he engaged in a mutually cordial and respectful email exchange with the Chief Judge of the District of South Dakota—transmitting a single letter conveying official USMS policy—before any of the hearings in question at the Aberdeen courthouse took place.  The Chief Judge had written a respectful letter to USMS Headquarters, addressed to Kilgallon, inquiring about USMS policies concerning vaccination. (Doc. 1-5 at 1).  In response, USMS wrote a respectful letter detailing the Agency's position, sent under Kilgallon's name because he happened to be the employee to

---

[10] USMS Policy Directive 1.1(D)(3) (Attached Ex. A at 6).

whom the Chief Judge had addressed his original correspondence.  (Doc. 1-6; 1-9). That is the sum of the entire case against Mr. Kilgallon.  There is zero evidence, let alone the requisite probable cause, that he did anything else in this case.

When faced with a situation involving a United States agent who acted in compliance with rules validly enacted by the Executive Branch in declining to comply with a subpoena duces tecum, the Supreme Court recognized in short order the unsuitability of criminal contempt charges.  In *United States ex rel. Touhy v. Ragen*, 340 US 462 (1951), an inmate of the Illinois State Penitentiary brought a habeas corpus action against the warden of the facility.  Through that proceeding, an FBI agent was served with a subpoena for certain records relating to the prisoner's conviction.  Relying on an order enacted by the Department of Justice to govern such situations, the agent declined to produce the records and the district court held him in criminal contempt.  The Seventh Circuit reversed, squarely holding that the FBI agent could not be held guilty of contempt for adhering to DOJ regulations because "courts have no jurisdiction or power to punish executive officers or employees for obeying the orders or instructions of their superiors in adhering to regulations promulgated pursuant to statutory authority and requiring them to refuse to disclose or divulge information, records, documents or other data." *United States ex rel. Touhy v. Ragen*, 180 F.2d 321, 324 (7th Cir. 1950).

Concluding that the Department of Justice order was validly promulgated under its statutory authority, the Supreme Court affirmed and agreed that the federal agent had properly declined to produce the documents despite the subpoena

and could not be held in criminal contempt.  *See id.* at 468-69; *Ex parte Sackett*, 74 F.2d 922, 923 (9th Cir. 1935) (concluding, as to the implicated regulation in that case, that the "regulation has the force of law, and the court had no jurisdiction or power to punish an officer for conforming to that law").

Additional illumination may be found in the only previous case the named law enforcement officials here have been able to locate involving criminal contempt charges against a United States Marshal.  Shortly after the turn of the nineteenth century, the Ninth Circuit reversed the criminal contempt conviction of the United States Marshal for the District of Alaska almost sixty years before that frontier territory became a state.  *See Richards v. United States*, 126 F. 105, 110-11 (9th Cir. 1903).  The conviction was based on accusations that the U.S. Marshal had arranged to assemble a jury panel with people preselected by a defense attorney. *See id*.  The Ninth Circuit held that the evidence, based upon pure supposition and circumstance, was insufficient as a matter of law:

> The most that can be claimed from it is that the marshal was on friendly terms with the attorney, and that it might, perhaps, be argued that on that account he would be more disposed to aid him in an attempt to influence a jury than he would be if that relation did not exist. Such an argument might properly be adverted to in conjunction with evidence sustaining the charges. It is not to be presumed, however, that a sworn officer of a court would, at the instance of his attorney, disregard his duty or lend himself to a scheme to subvert the ends of justice.

*Id.* at 111; *see also In re Brown*, 454 F.2d 999, 1008 (D.C. Cir. 1971) (vacating criminal contempt conviction for insufficient evidence of intent, explaining "[a]n

inferred fact must find its nexus with a proven fact, and a conviction of crime cannot rest on evidence that no more supports guilt than innocence").

The Eighth Circuit has mandated that "[c]ontempt should be clear and certain." *Imageware, Inc. v. U.S. West Communications*, 219 F.3d 793, 797 (8th Cir. 2000).  The law enforcement officials charged in this case have not committed crimes and certainly never intended to do so.  They have the utmost respect for the Court and all of the members of the Judiciary they serve in performing their critical mission.  Their alleged conduct involved no disrespect or defiance of the Court. Chief Deputy Houghtaling, the only charged individual who even interacted with the Court (by telephone), was at all times courteous and respectful.  As the district court emphasized at the June 14, 2021 hearing, "I am not personally offended by this, nobody said anything that was disrespectful. They just acted in a contemptuous manner – criminal contempt." (HT at 12).

Because there is not even the slightest evidence or probable cause of any criminal intent, none of the specifications under 28 U.S.C. § 401 can be sustained. They should be dismissed under this Court's inherent authority to do so.  *See Gates*, 600 F.3d at 342 (4th Cir. 2010) (reversing criminal contempt proceeding on procedural grounds and dismissing charges because "the record completely lacking any evidence from which the court could find that Gates had the requisite criminal intent to support a conviction under § 401(3)" and "in light of the record, remanding the case for a hearing under Rule 42(a) would serve no purpose"); *Romero v. Drummond Co., Inc.,* 480 F.3d 1234, 1243-44 (11th Cir. 2007) (vacating criminal

contempt conviction where it was unsupported by the evidence, explaining that "[i]f the district court based its finding of contempt on the circumstantial evidence of the existence of the article, that evidence was insufficient to prove a willful violation beyond a reasonable doubt"); *Vaughn v. City of Flint,* 752 F.2d 1160, 1169 (6th Cir. 1985) (holding that there was "insufficient evidence to sustain the adjudication of criminal contempt since proof of the requisite intent is lacking"); *United States v. Maynard*, 933 F.2d 918, 920-21 (11th Cir. 1991) (reversing and dismissing criminal contempt convictions for insufficient evidence).

## III.   Position on jury trial.

For prudential reasons, U.S. Marshal Mosteller, Chief Deputy Houghtaling, and Mr. Kilgallon have demanded a jury trial and have not elected to waive those rights.   They fully understand and acknowledge, however, the controlling legal authority that "[p]etty contempt like other petty criminal offenses may be tried without a jury."   *Int'l Union United Mine Workers*, 512 U.S. at 837 n.5 (quoting *Taylor*, 418 U.S. at 495); *see also Weeks*, 570 F.2d at 246 n.3.   They further are grateful for this Court's findings regarding the nature of these proceedings in section 11.A of its Order following the status conference in this case.   (Doc. 39 at 5).

## <u>CONCLUSION</u>

As one federal appellate court has cautioned: "Criminal contempt of court is a dark stain on an attorney's record, even when it does not lead to imprisonment or a substantial fine.   That is among the reasons why a conviction under 18 U.S.C. § 401 depends on proof of willful misconduct." *United States v. Mottweiller*, 82 F.3d 769 (7th Cir. 1996).   That principle holds true in perpetual multiples for career law

enforcement officials and dedicated public servants such as a United States Marshal, Chief Deputy Marshal, and USMS Chief of Staff.

Although the separation of powers was designed "to control the power of government by tension among the branches, with each, at the margin, limiting the other," the Framers "did not envision a government in which each branch seeks out confrontation; they hoped the system of checks and balances would achieve a harmony of purposes differently fulfilled." *Levi, supra* at 391. The law enforcement officials here were caught between conflicting duties imposed by irreconcilable orders given by separate branches of government with equal authority and equally important purposes to fulfill. Under these unique and emergent circumstances, they did the best they could to navigate those duties as safely and as respectfully as they could. It is not for them to say how these competing principles should have been resolved. But the answer, decidedly, is not to charge them with crimes.

WHEREFORE, U.S. Marshal Mosteller, Chief Deputy Houghtaling, and Mr. Kilgallon respectfully request this Honorable Court to grant the motion to dismiss.

Dated this 20th day of August, 2021.

JOHNSON, JANKLOW
ABDALLAH & REITER, L.L.P.

By _____
    Ronald A. Parsons, Jr.
    Scott A. Abdallah
    P.O. Box 2348
    Sioux Falls, SD 57101-2348
    (605) 338-4304

    *Attorneys for Kilgallon*

GUNDERSON, PALMER
NELSON & ASHMORE, L.L.P.

By _____
    Marty J. Jackley
    111 West Capitol Avenue, Suite 230
    Pierre, SD 57501
    (605) 494-0105

    *Attorneys for Mosteller and Houghtaling*

43